THE LEON A. BEEGHLY FUND, THE UNION NATIONAL BANK OF YOUNGSTOWN, OHIO, TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 55061. Filed December 30, 1960.

*Howard F. Bvrns, Esq., L. C. Weiss, Esq., William H. Fleming, Esq.,* and *Alan G. Rorick, Esq.,* for the petitioner.

*William O. Allen, Esq.,* for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioner's income tax for the year 1949 in the amount of $10,280,673.27. The deficiency results from respondent's determination that petitioner was not an exempt organization in 1949 and that an accumulation of patent royalties and infringement claims, totaling $15,366,841.12, which had been paid into the registry of various courts by orders of those courts in various patent litigations and which were released to petitioner in 1949 was taxable in its entirety as ordinary income to petitioner in 1949.

The issues were, first, whether petitioner was exempt from Federal income tax for the calendar year 1949 under the provisions of section

101(6), I.R.C. 1939,[1] and, if not exempt, second, whether respondent correctly determined the amount of tax due. Because of the fact that a decision of the first issue in favor of petitioner would make unnecessary a decision of the second issue, which it was anticipated would require voluminous evidence, the issues were severed and evidence was first presented on the exemption issue alone. After considering the evidence presented and the briefs of the parties on the first issue, it was concluded tentatively that petitioner did not qualify as an exempt organization under section 101(6), and on October 21, 1959, an order was entered restoring the proceeding to the trial docket for presentation of any additional evidence desired to be presented by either party on all issues in the case. No written opinion was filed at that time.

It then appeared that the issues remaining for decision were the basis, if any, of petitioner in the patents and claims upon which the royalties had been paid, and whether petitioner was engaged in business in the years 1947 through 1950 so as to be entitled to net operating loss carryovers from 1947 and 1948 and a net operating loss carryback from 1950 in computing its net operating loss deduction for 1949.

On June 8, 1960, petitioner filed a third supplemental petition raising for the first time the issue whether it is entitled to a deduction under section 162(a) for amounts not actually paid over to charities in 1949. (Respondent had allowed a deduction for amounts actually paid to charities in 1949.)

On July 6, 1960, the parties filed a second supplemental stipulation of facts in which they agreed upon petitioner's basis in all assets received by petitioner on liquidation of Cold Metal Process Company in December 1945; the proportion of the funds received in 1949 which was attributable to basis; that all receipts in 1949 in excess of the amounts attributable to basis were taxable as ordinary income in the event petitioner was not tax exempt or the amounts received were not deductible under section 162(a); and the amounts of petitioner's operating losses for the years 1947, 1948, and 1950, in the event petitioner was found to be engaged in business in those years and in 1949.

As a result of the supplemental stipulation of facts there remain for decision the following issues: (1) Whether petitioner was exempt from Federal income tax for the calendar year 1949 under the provisions of section 101(6); and, if not exempt, (2) whether petitioner is entitled to a deduction under section 162(a) for amounts received but not paid over to charities in 1949; and (3) whether petitioner was engaged in a trade or business.

Respondent has on two previous occasions attempted to tax the larger part of the funds received by petitioner in 1949. In *Cold Metal Process Co.*, 17 T.C. 916, respondent attempted to tax $10,600,000 of

---

[1] All references are to the 1939 Code unless otherwise indicated.

the funds here involved to the Cold Metal Process Company as royalty income for the year 1945 and joined petitioner as transferee. This Court held that inasmuch as the $10,600,000 was paid pursuant to patents the Government was seeking to cancel in a suit against the taxpayer then pending on appeal in the Sixth Circuit, the income was not accruable or taxable in the year 1945.

Later in *Cold Metal Process Co.*, 25 T.C. 1333, respondent sought to tax the entire amounts received by the trustee in 1949, and which are here involved, totaling over $15 million, to the Cold Metal Process Company as income for the year 1949, and also joined petitioner herein as transferee. In that case this Court held that the Cold Metal Process Company, despite its dissolution on December 29, 1945, was still in existence for tax purposes and that that portion of the funds received in 1949 which represented royalties and amounts paid for infringement of patents on production prior to December 29, 1945, was income earned but not accruable in 1945 and was taxable to the corporation in 1949 when paid, but that that portion of the funds received in 1949 representing royalties and infringement claims based on production after December 29, 1945, and interest earned after that date were not taxable to the corporation and, consequently, were not taxable to the trustee as transferee. The Court of Appeals for the Sixth Circuit reversed the Tax Court in part and held that the corporation was not taxable on any of the income both because it was no longer in existence in 1949 and because the royalties and infringement payments on production prior to dissolution of the corporation could not be considered earned at that time so as to come within the rule that anticipatory assignment of earned income to be paid in the future will be taxable to the assignor.

Respondent in this proceeding is attempting to tax the funds released to the trustee in 1949 to the trust in its own right.

### FINDINGS OF FACT.

On December 28, 1940, Leon A. Beeghly of Youngstown, Ohio, entered into a trust agreement, hereafter referred to as the trust agreement, with the Union National Bank of Youngstown, Ohio. The trust created thereby will hereafter be referred to as the trust, the Beeghly Fund, or petitioner. Simultaneously with the execution of the agreement, Leon A. Beeghly transferred by gift to the Union National Bank of Youngstown, Ohio, as trustee under the trust agreement, hereafter referred to as trustee, 150 shares of common stock of the Cold Metal Process Company, hereafter referred to as Cold Metal, and on December 30, 1940, a certificate for 150 shares was issued in the name of "Union National Bank, Youngstown, Ohio, Trustee under agreement with Leon A. Beeghly, dated December 28, 1940." Thereafter, on

December 30, 1944, Beeghly transferred 1 additional share of common stock of Cold Metal to the Beeghly Fund as a gift, and on December 30, 1944, a certificate for 1 share was issued in the name of "Union National Bank, Youngstown, Ohio, U/A with Leon A. Beeghly dated 12/28/40."

The trust agreement was irrevocable; however, the donor reserved the power to extend the date for the final termination of the trust. In accordance with this reserved power, the term of the trust was extended by agreement between the donor and trustee dated June 22, 1953, to the 25th anniversary of the date of the death of the donor.

The trust agreement provided:

THAT, WHEREAS, the Donor has determined irrevocably to set aside a part of his estate as an irrevocable trust and desires the proceeds therefrom to be used solely and exclusively for religious, charitable, scientific, literary or educational purposes; * * *

\* \* \* \* \* \* \*

Now, THEREFORE, the Donor * * * does hereby assign, transfer and deliver to said Trustee, the securities * * * described in the schedule attached hereto, * * * and does hereby create an irrevocable trust for the use and benefit of corporations or associations, trust or community chest, funds or foundations, created or organized in the United States or under the laws of the United States to [or] any State or Territory or any possession of the United States, organized and operated exclusively for religious, charitable, literary or educational purposes or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual and no substantial part of the activities of which is carrying on propaganda or otherwise attempting to influence legislation.

The trustee was empowered, among other things, "To invest and reinvest the trust fund or any part thereof in such securities as said Trustee in its discretion shall deem to be for the best interest of the trust estate and the purposes hereof" providing the trustee was not permitted to purchase securities or property from itself; "To sell, transfer, exchange, and deliver, free and clear of all trusts, any part of the trust estate from time to time, at such prices and for such terms and conditions as to it shall seem proper"; and "To participate in the liquidation, reorganization, * * * or other financial readjustment of any corporation or business in which the trust estate is or shall be financially interested."

For the purpose of directing the disbursement by the trustee of the net income from and principal of the trust estate, the trust agreement provided for an appointing committee to designate such disbursement of income or principal. The appointing committee consisted of the donor, his wife, Mabel L. Beeghly, and Charles N. Beeghly, son of the donor. In the event of the death, resignation, or failure to act of any of the members of the committee, the trust agreement provided that the remainder of the committee should promptly name any child of

the donor as a member of the committee. The trust agreement also provided:

The Appointing Committee shall, from time to time, in writing, in form satisfactory to the Trustee, direct the payment of the net income from the trust estate and the disbursement of the principal thereof at the times hereinafter provided among corporations, associations, trusts, community chests, funds or foundations created or organized in the United States or in any possession thereof or under the laws of the United States or any State or Territory or of any possession of the United States, organized and operated exclusively for religious, charitable, scientific, literary or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual and no substantial part of the activities of which is carried [sic] on propaganda or otherwise attempting to influence legislation. Throughout the life of this trust the Appointing Committee shall direct the disbursement of the net income therefrom to one or more of the above named purposes and, in the manner above provided, either in the year in which the income becomes a part of the trust estate or in the following year.

Upon the termination of the trust the trust agreement provides that the trustee shall immediately thereafter transfer any part of the trust estate then remaining to the Youngstown Foundation to be held, administered, and disbursed by the foundation in its discretion for one or more of the purposes above, subject, however, to the provision that of the funds coming to the foundation under this provision, at least 10 per cent shall be distributed for such uses of the Methodist Church in Mahoning County, Ohio, as the then district superintendent may direct in writing, and at least a further 15 per cent shall be distributed for such uses of the Methodist Church as the then bishop of the Youngstown, Ohio, area may direct in writing. The trust agreement also provided:

Out of the gross income of the trust estate the Trustee shall pay, as it deems advisable, all property, income tax, general and special assessments which may be legally payable by reason of this trust or the trust property; and all costs, charges, attorneys' fees, expenses and liabilities of every kind expended or incurred in the collection, care, holding, administration, protection or distribution of the income of the trust estate, for the payment of which the trust estate or the Trustee may become chargeable, including the protection of this trust and its defense against legal attack, and also including a compensation for the corporate Trustee's services hereunder * * *

Both the Youngstown Foundation and the Methodist Church are organizations listed by the United States Treasury Department, Bureau of Internal Revenue, in its "Cumulative List of Organizations, Contributions to Which are Deductible under Section 23(o) and Section 23(q) of the Internal Revenue Code and the Corresponding Sections of Prior Revenue Acts" as in effect since the creation of the trust to and including the year 1949.

On August 12, 1941, the Commissioner of Internal Revenue issued

a ruling that petitioner herein was exempt from Federal income tax under the provisions of section 101(6). On or about June 23, 1948, the Commissioner sent a letter to "The Leon A. Beeghly Fund" modifying his original determination of August 12, 1941, and holding that beginning December 28, 1945, the Beeghly Fund was no longer exempt under section 101(6). In the letter of modification, the Commissioner made no change in his earlier ruling that the Beeghly Fund was organized exclusively for the charitable purposes stated in section 101(6), nor was there any suggestion that the trust had not been operated exclusively for charitable purposes during the period December 28, 1940, through December 27, 1945.

Petitioner from the time of its creation has kept its books and filed its information returns on a cash basis. It filed information returns (Form 990) for the years 1941 through 1949, with the collector of internal revenue for the eighteenth district of Ohio.

Cold Metal, an Ohio corporation, was incorporated in 1926 with an authorized capital stock of 2,000 shares. It was organized for the purpose of owning, developing, and commercializing certain inventions relating to the hot and cold rolling of metals and employing these inventions in the manufacture and rolling of metals.

For the period 1940 through 1945, Cold Metal was a personal holding company. It filed Forms 1120 PH, "Return of Personal Holding Company," for those years with the collector of internal revenue for the eighteenth district of Ohio.

In 1927, Abram P. Steckel, one of the original shareholders, assigned to Cold Metal all of his interest in certain inventions then covered by a patent application. Pursuant to this application, United States Patent No. 1,744,016, hereafter referred to as patent '016, was granted to Cold Metal on January 14, 1930, and United States Patent No. 1,779,195, hereafter referred to as patent '195 was issued to Cold Metal on a divisional application on October 21, 1930.

The processes covered by patents '016 and '195 gained wide usage in the metal industry, and beginning in 1928 Cold Metal granted nonexclusive licenses to certain manufacturers to employ its inventions covered by these patents in the hot and cold rolling of steel and of other metals. Numerous other manufacturers, not licensed by Cold Metal, installed rolling mills which Cold Metal claimed embodied its inventions and infringed its patents, as a result of which Cold Metal brought numerous suits for infringement against large steel-producing companies.

One of the first of these infringement suits was brought in 1934 in the District Court of New Jersey against United States Steel Corporation and one of its subsidiaries. After extended litigation the Court of Appeals for the Third Circuit held both patents '016 and '195 to be

valid and infringed. The Supreme Court denied a petition for certiorari and a petition for rehearing to review this decision. Thereafter the Court of Appeals for the Third Circuit granted a petition for rehearing but before the rehearing could be had Cold Metal and Carnegie-Illinois Steel Corporation entered into a settlement agreement on August 30, 1940, under which Carnegie agreed to pay $3,850,-000 for past infringement and Cold Metal granted to Carnegie, and all other subsidiaries of United States Steel Corporation, on a royalty basis, an unlimited, nonexclusive license under patents '016 and '195 and two other patents owned by Cold Metal. Carnegie paid $3,850,-000 to Cold Metal in 1940 and 1941.

Both before and after the conclusion of the suits against United States Steel Corporation, Cold Metal made efforts to negotiate license agreements and agreements for settlement of infringement claims with various other steel companies which were claimed to be infringing Cold Metal's patents. Several such agreements were made with different steel companies, but when certain claimed infringers refused to take licenses under Cold Metal's patents, suits were brought during 1942 and 1943 against the American Rolling Mill Company, Bethlehem Steel Company, Crown Cork & Seal Company, Inc., Jones & Laughlin Steel Corporation, Republic Steel Corporation, Wheeling Steel Corporation, and the Youngstown Sheet and Tube Company, among others.

In 1941, the Cold Metal Products Company, hereafter referred to as Products Company, was formed to take over the manufacturing activities formerly carried on by Cold Metal, and all assets relating to these operations were transferred by Cold Metal to Products Company as of September 1, 1941, in return for its entire capital stock, consisting of 2,000 common shares without par value. Thereafter Cold Metal's principal assets, in addition to the stock of Products Company, were patents, patent applications, license agreements, and infringement claims. Its principal activities were the exploitation of the inventions and the prosecution and defense of legal actions relating to them. Its principal income was from dividends and royalties. From the time of its organization and continuing through the year 1945, Products Company engaged in the business of rolling strip steel and the building of steel rolling mills. Both the operations of rolling strip steel and the building of mills by Products Company were carried on under the protection of patents '016 and '195 owned by Cold Metal.

On July 27, 1943, the United States filed a bill of complaint in the United States District Court for the Northern District of Ohio, Eastern Division, against Cold Metal. This case is hereafter referred to as *United States* v. *Cold Metal* or the cancellation case. In the above suit the United States asserted that patents '016 and '195 had been

secured from the Patent Office either through fraudulent representations or as a result of mutual mistake of fact and that each of the patents should be canceled in its entirety *ab initio*. These charges were denied by Cold Metal.

On October 10, 1944, the District Court, upon the motion of the United States in *United States* v. *Cold Metal*, which motion was vigorously opposed by Cold Metal, entered an interlocutory order granting temporary injunction and impounding funds. This order enjoined Cold Metal, its officers, directors, agents, attorneys, and representatives, among other things, (a) from receiving any further moneys by way of royalties, payments in settlement of claims, satisfactions of judgments for damages, or otherwise, on account of patents '016 and '195; (b) from taking any steps for the collection of payments under these patents or under contracts entered into or judgments obtained by virtue of these patents other than the reduction of claims to judgment, or effecting settlements of claims or the authorization, direction, or enforcement of directions to persons owing or believed to owe said moneys, to deposit said moneys with the clerk of the District Court to await further order of that court; and (c) from transferring in any manner whatsoever patents '016 and '195. No funds were paid into the registry of the District Court in this case until December 29, 1945.

After trial a decision in the case of *United States* v. *Cold Metal* was entered for Cold Metal. The bill was dismissed in its entirety on September 20, 1945. The United States appealed this decision and on its motion, vigorously opposed by Cold Metal, the interlocutory order of October 10, 1944, was restored on October 8, 1945, and ordered to remain in full force and effect pending the determination of the action by the Court of Appeals. By virtue of the order restoring temporary injunction and order impounding funds, the interlocutory order previously granted by the District Court was continued in force until after the final disposition of the above case by affirmance of the District Court decision on December 12, 1947, by the Court of Appeals, and denial of the petition for writ of certiorari and the petition for rehearing by the Supreme Court on May 3 and June 1, 1948, respectively. The interlocutory order entered October 10, 1944, as restored by the order of October 8, 1945, is hereafter referred to as the interlocutory order.

Beginning in June 1942, and in connection with efforts to settle the infringement claims, negotiations were carried on through representatives of Cold Metal's shareholders with a group of steel companies looking toward the purchase by the steel companies of all the stock of Cold Metal. These negotiations continued with more or less regularity until December 1945.

In connection with these negotiations by the shareholders of Cold Metal for a sale of all their stock to the steel companies, various applications to the Treasury Department were prepared seeking a closing agreement as to the tax consequences of such a sale to the stockholders and the purchaser of the shares.

The plan was for the shareholders of Cold Metal to sell their shares and thus dispose of their investment on the basis of a capital gains tax.

The matter of the disposition of Products Company in the event of a sale of Cold Metal stock to the steel companies had long been a matter of discussion among the shareholders and directors of Cold Metal. During the negotiations between Cold Metal and the steel companies commencing in June 1942, the steel companies had said they were not interested in acquiring Products Company or its assets as part of the settlement proposals. Leon A. Beeghly and certain other Cold Metal shareholders, hereafter referred to as the Beeghly group, expressed a willingness to purchase the stock of Products Company but Steckel, who had long opposed Cold Metal's participation in the mill building and strip rolling operations which were transferred to Products Company in 1941, and other shareholders, hereafter referred to as the Steckel group, did not wish to participate in the ownership of Products Company in the event the Cold Metal stock was sold to the steel companies. A figure of $1 million as the purchase price of the Products Company stock was used in the negotiations with the steel companies.

In the negotiations for the sale of all shares of Cold Metal to the steel companies, or somebody representing them, during the latter part of 1945, the steel companies insisted that any settlement be made before expiration of the excess profits tax on December 31, 1945; however, they refused to purchase the Cold Metal stock while the cancellation case was still pending. These negotiations finally failed in December 1945, because of the refusal of the United States to dismiss the appeal in *United States* v. *Cold Metal.*

Prior to the final failure of the negotiations to sell all shares of Cold Metal to the steel companies, and as early as September 1945, an alternative plan was suggested by the Beeghly group of shareholders and submitted to the steel companies whereby the shareholders would sell all of their stock in Cold Metal to the trustee of the Beeghly Fund, Cold Metal would dissolve and convey all of its assets to the trustee as sole shareholder, the trustee would sell the shares of Products Company to the Beeghly group for $1,250,000, and then the trustee would negotiate settlement agreements with the steel companies.

The proposed plan to sell the other outstanding shares of Cold Metal to the trustee was considered from the beginning as merely an alternative plan for the sale of stock by the shareholders of Cold Metal in the

event that negotiations to sell Cold Metal's shares to the steel companies or some party representing them were not successful.

In August and September 1943, notices were issued by various departments of the United States Government under the Royalty Adjustment Act (35 U.S.C. secs. 89–96) to Cold Metal and various licensees of Cold Metal stating that the royalties being paid directly or indirectly by the United States to Cold Metal were believed to be unreasonable; and licensees were directed to withhold payment of such royalties until the issuance of an order under the act. On December 29, 1944, the Royalty Adjustment Board determined that the fair rate of royalty on patents '016 and '195 was zero and issued an order to that effect. The order also directed the licensees to pay all royalties not theretofore paid to licensor to the Treasurer of the United States. As Cold Metal's principal income was from royalties, the effect of these notices, the royalty adjustment order, and the interlocutory order was to cut off substantially all income of Cold Metal and to deprive Cold Metal's shareholders of all income by way of dividends.

As a result of the cessation of income to Cold Metal and the discontinuance of dividends, the shareholders became increasingly interested in 1943, 1944, and 1945 in selling their shares.

Owing to internal friction among the stockholders and directors of Cold Metal, all contracts of settlement, licenses and other similar matters were required to be authorized by the board of directors, and no officers or attorneys of Cold Metal were authorized to conclude settlements without such action.

Four of the six members of Cold Metal's board of directors, who owned or acted for about 1,750 of the 2,000 outstanding shares, were unwilling to make a direct settlement between Cold Metal and the steel companies and insisted throughout the negotiations in 1945 that any settlement must take the form of a sale of shares to the steel companies or someone else.

No one of the four directors was willing to authorize a direct settlement between Cold Metal and the steel companies on the terms later effected in the settlement between the steel companies and the trustee.

After the negotiations to sell the stock of Cold Metal to the steel companies had finally broken down in late 1945, the alternative plan to sell to the trustee was agreed upon. On December 28, 1945, each shareholder of Cold Metal other than the trustee entered into a written contract for the sale of his shares to the trustee. Each contract was identical except as to the name of the shareholder, the number of shares to be sold, and the selling price, which varied from $4,250 to $7,500 per share. These contracts provided for the payment of $200 in cash and additional payments—

subject to the payment to the Trustee, as Trustee, by the Clerk of the United States District Court for the Northern District of Ohio, Eastern Division, of

the funds in the registry of said Court as hereinbefore mentioned, and the payment to the Trustee, as Trustee, by sundry licensees of royalties under patents formerly owned by The Cold Metal Process Company following appropriate modification or rescission of the certain order of the "Royalty Adjustment Board for The Cold Metal Process Company" heretofore created under Public Law #768 of the laws of the United States, and after the Trustee has paid, or has on hand sufficient funds to pay, all taxes and other liabilities of said Corporation necessarily incident to the dissolution thereof, * * *

A total of 1,849 shares was covered by such agreements. The trustee already owned the remaining 151 shares.

The difference in the price agreed to be paid to the several shareholders in the contracts arose from the following facts: During the negotiations with the steel companies, the Steckel group of stockholders were more pessimistic as to the outlook of the company and the pending litigation than were the Beeghly group of stockholders. As a result of this the Steckel group asked a much smaller price for their stock from the steel companies than the Beeghly group, although both were fully familiar with the prices being asked by other shareholders. When it came to agreeing upon the price at which the shareholders would sell to the trustee, the pessimism of the Steckel group and the optimism of the Beeghly group resulted in the Steckel group being allowed a very substantial preference as to the time of payment and the Beeghly group, who took a junior position as to the time of payment, being allowed a larger price per share. As a result of this arrangement, the Steckel group received the final payment for their shares during the year 1953 and the Beeghly group had received only $1,000 of the purchase price of their stock down to the time of trial.

At the time of making these agreements the trustee had $19.58 in cash and its only other assets at that time were 151 shares of Cold Metal stock and dividend notes previously received on stock of Cold Metal in the amount of $2,250. At this time the principal assets of Cold Metal were 2,000 shares of Products Company stock; 25 United States patents, the principal ones being patents '016 and '195; a large number of claims against patent infringers, many of which were in suit; claims for royalties under license agreements; and $60,445.20 in cash.

The total price which the trustee agreed to pay for the 1,849 shares of Cold Metal stock was $11,131,000, consisting of 482 shares at $4,250 per share, 468 shares at $5,000 per share, and 899 shares at $7,500 per share. This was below the minimum price which the same shareholders had placed on their stock in negotiations with the steel companies. Two members of the Steckel group had asked $5,000 per share for their stock when its sale to the steel companies was being considered. They reduced their price to $4,250 in selling to the trust. The Beeghly group had asked $12,500 per share from the steel com-

panies for their stock and sold to the trust at $7,500 per share. The purchase by the trust of 1,849 shares of Cold Metal stock on December 29, 1945, was coupled with the settlement of infringement claims and suits against six steel companies under which the steel companies agreed to and did pay $9 million into the registry of the District Court in the cancellation case. The agreements under which the payments were made into the registry of the District Court were unconditional and provided that the steel companies would make no claim to the funds irrespective of the outcome of the cancellation case or the royalty adjustment proceedings.

In addition to the stock purchase agreement, the trustee assumed a liability of Cold Metal to Products Company in the sum of $578,182.44 and current liabilities of Cold Metal in the sum of $301,105.54. Thus the trustee's obligation totaled $12,010,287.98. Further, it was apparent that if the trustee was to realize anything for itself it would have to continue the cancellation, royalty adjustment, and probably the infringement litigation with respect to the Steckel patents, which had been and would probably continue to be expensive.

As of December 31, 1945, the trustee had claims for amounts then due totaling $16,079,276.06, made up of the following:

| | |
|---|---:|
| On deposit in the registry of court in the cancellation case | $9,600,000. 00 |
| Agreed settlement payments from Allegheny and Wallingford | 1,000,000. 00 |
| Proceeds of sale of Products Company stock | 1,250,000. 00 |
| Royalties due under license agreements for production prior to Sept. 1, 1945 | 3,442,491. 00 |
| Royalties on production from Sept. 1 to Dec. 31, 1945 | 786,785. 06 |
| Total | 16,079,276. 06 |

As of December 28, 1945, none of these assets were available for the payment of the obligations assumed by the trustee. Because of the impounding orders issued in the cancellation and royalty adjustment cases, the only assets available for those purposes were the cash on hand of Cold Metal and the amounts which could be obtained by the sale of the Products Company stock. Accordingly, it was understood and agreed that the trustee after transfer to it of Cold Metal's assets would acquire the necessary cash to make the initial payment to Cold Metal shareholders by sale of the stock of Cold Metal's subsidiary, Products Company.

Throughout the negotiations with the steel companies the Steckel group had stated that they did not wish to participate in the purchase of Products Company. In view of this situation, the Beeghly group undertook to purchase the Products Company stock from the trustee for $1,250,000 as a part of the transaction in which the trustee was purchasing the Cold Metal shares, paying $375,000 in cash, thus

enabling the trustee to make the downpayment of $200 for each of the 1,849 Cold Metal shares aggregating $369,800.

There was never any negotiation or discussion as to the trust selling the Products Company stock to the Beeghly group or to anyone else as a separate transaction; the only proposal ever considered or discussed was that the trustee would buy 1,849 shares of Cold Metal stock from the other shareholders and that as part of the same transaction W. H. Kilcawley, as agent of the Beeghly group, would purchase the 2,000 shares of Products Company stock for $1,250,000 to be held for those Cold Metal shareholders other than petitioner who wished to participate in such purchase, and the transaction was consummated on that basis.

Pursuant to the contracts of sale, certificates for the entire 1,849 shares were delivered to the trustee duly endorsed on December 29, 1945, and checks for $200 per share were delivered to the shareholders. The endorsed certificates delivered by the shareholders to the trustee were surrendered by the trustee to Cold Metal, were marked "cancelled," and three new certificates aggregating 1,849 shares dated December 29, 1945, were on that day issued and delivered to the trustee.

After the sale of the 1,849 shares to the trustee, a shareholders meeting of Cold Metal was duly held at 10:30 a.m., December 29, 1945, at which meeting resolutions were duly adopted (a) to dissolve the corporation and directing the officers to file a certificate of dissolution, and (b) authorizing an assignment and distribution in kind of all assets of Cold Metal to the trustee as sole shareholder, subject only to the restrictions imposed by the interlocutory order.

Immediately following the shareholders meeting on December 29, 1945, the officers of Cold Metal executed and delivered to the trustee an instrument entitled "Assignment and Distribution in Kind" conveying all assets of Cold Metal to the trustee, subject to all the outstanding liabilities of Cold Metal, which the trustee expressly assumed, and subject to the restrictions of the interlocutory order. In addition, the trustee agreed to become a party to the cancellation suit.

Following the shareholders meeting and on December 29, 1945, a certificate of dissolution of Cold Metal was duly filed with the secretary of state of Ohio.

Cold Metal was dissolved on December 29, 1945, and liquidated by the transfer of all of its assets to the trustee, its sole shareholder, subject only to the formal record transfer of certain patents.

Also on December 29, 1945, W. H. Kilcawley, L. A. Beeghly, and the Standard Slag Company borrowed $375,000 from the Union National Bank of Youngstown and signed a note for that amount. The proceeds of said loan were immediately paid by Kilcawley to the

trustee as the downpayment on a certain contract between Kilcawley as principal and as agent for other undisclosed parties to purchase all 2,000 shares of the common stock of Products Company for a total consideration of $1,250,000 of which $375,000 was payable in cash.

The consideration or approval by the board of directors of petitioner's trustee, the Union National Bank of Youngstown, Ohio, of the petitioner's participation in the transactions of December 1945 is not recorded in the minutes of any regularly scheduled meetings of the board except as shown by the minutes of the executive committee of the board of December 28, 1945, and the minutes of the directors of January 9, 1946. The only reference in these minutes is to the approval of the loan of $375,000 to the Standard Slag Company and L. A. Beeghly.

The minutes of the trust committee of petitioner's trustee of June 28, 1946, contain the following references to the transactions of December 1945:

The matter of the purchase of the stock of the Cold Metal Process Company, the dissolution of the company and the sale of Cold Metal Products Company stock in the L. A. Beeghly Trust was explained by Mr. Ogram and other officers who stated that the transaction had been brought to the attention of the Executive Committee at its meeting December 28, 1945, when a $375,000.00 loan to W. H. Kilcawley, et al, had been approved to purchase Cold Metal Products Company stock from the L. A. Beeghly Trust. The initial payment of $375,000.00 was used by the Beeghly Trust to make the initial payment of $200.00 per share on 1849 shares of Cold Metal Process Company stock which was purchased by the Trustee.

Motion was made and duly seconded that these matters, including the acts of the officers in connection with the Beeghly fund, be approved * * *

During the period January 8, 1941, to the present time, Leon A. Beeghly has been a director of the Union National Bank of Youngstown, but was never a member of the trust committee of this bank.

Vern Wilson and J. M. Ogram, who were president and trust officer, respectively, of the Union National Bank of Youngstown during the year 1945, are both deceased.

Although W. H. Kilcawley as agent for the Beeghly group agreed to pay petitioner the $1,250,000 purchase price of the Products Company stock on or before December 31, 1946, the purchase price was not finally paid until May 2, 1955, but interest was regularly paid to petitioner on the unpaid balance of the purchase price.

In Pittsburgh, on December 28, 1945, six steel companies, hereafter enumerated, each signed in triplicate a separate document entitled "Agreement." These six agreements were printed and were in substantially identical form. Under the terms of these agreements each of the steel companies was to secure a license, on a royalty basis, under patents '016 and '195 and other patents then owned by Cold Metal and was to pay certain amounts into the registry of the District Court

in *United States* v. *Cold Metal* for past infringement of these patents as follows:

| | |
|---|---:|
| The American Rolling Mill Corporation | $2,407,500 |
| Bethlehem Steel Co. | 2,132,100 |
| Crown Cork & Seal Co., Inc. | 200,700 |
| Jones & Laughlin Steel Corporation | 1,380,600 |
| Wheeling Steel Corporation | 1,643,400 |
| The Youngstown Sheet and Tube Co. | 1,235,700 |
| Total | 9,000,000 |

In Youngstown on December 29, 1945, after the holding of the shareholders meeting and the delivery of the "Assignment and Distribution in Kind" to the trustee, a special meeting of the directors of Cold Metal was held at which meeting the directors authorized the officers of Cold Metal to join with the trustee (a) in executing the six settlement agreements which had been executed by the steel companies on December 28, 1945, and (b) in executing agreements with Allegheny-Ludlum Steel Corporation, herein referred to as Allegheny, and Wallingford Steel Company, herein referred to as Wallingford, calling for a payment of $700,000 and $300,000, respectively, in settlement of past infringement claims.

In Cleveland on December 29, 1945, there were delivered to the clerk of the District Court six certified checks of the six steel companies payable to the clerk in the total sum of $9 million, with instructions to hold these sums in the registry of the court subject to the interlocutory order in *United States* v. *Cold Metal*. Pursuant to the interlocutory order the $9 million was continuously retained in the registry of the court until July 26, 1948.

On December 31, 1945, the trustee and Cold Metal entered into a settlement agreement with Inland Steel Company, under the terms of which agreement Inland Steel Company secured a license under patents '016 and '195 and other patents and agreed to pay $600,000 into the registry of the District Court for past infringement of these patents. Pursuant to the interlocutory order, the $600,000 was paid on December 31, 1945, into the registry of the District Court and was continuously retained therein until July 26, 1948.

On March 19, 1946, the trustee and Cold Metal entered into a settlement agreement with Signode Steel Strapping Company, under the terms of which agreement Signode secured a license under patents '016 and '195 and other patents and agreed to pay $39,000 into the registry of the District Court for past infringement of these patents. Pursuant to the interlocutory order the $39,000 was paid into the registry of the District Court and was continuously retained there until July 26, 1948.

On or about January 15, 1946, petitioner sent 11 letters to attorneys who had represented Cold Metal. The letters informed the attorneys that petitioner had succeeded to the assets of Cold Metal and authorized the attorneys to carry on all litigation in behalf of the trustee.

On May 31, 1946, the District Court in *United States* v. *Cold Metal* entered an order on defendants' motion to modify the interlocutory order granting temporary injunction and impounding funds, under the terms of which the interlocutory order was so modified as to permit Cold Metal to make a formal transfer of record to the trustee of patents '016 and '195, together with all rights thereunder, including all causes of action arising out of these patents. This modification was granted upon the express condition that the trustee would enter its general appearance in the case of *United States* v. *Cold Metal* and subject itself to the orders of the District Court and the Court of Appeals in this case.

Thereafter on June 1, 1946, petitioner entered its general appearance and subjected itself to the orders of the courts in *United States* v. *Cold Metal*. On June 3, 1946, Cold Metal duly transferred to petitioner by formal recorded "Assignment" all its right, title, and interest in and to patents '016 and '195 and all claims and demands growing out of these patents.

On September 30, 1946, the trustee entered into a settlement agreement with Crucible Steel Company of America, under the terms of which Crucible secured a license under patents '016 and '195 and other patents and agreed to pay $110,000 into the registry of the District Court for past infringement of said patents. Pursuant to the interlocutory order, $110,000 was paid into the registry of the District Court on October 11, 1946, and was continuously retained there until July 26, 1948.

On December 12, 1947, the decision of the District Court in *United States* v. *Cold Metal* was affirmed by the Court of Appeals for the Sixth Circuit.

On January 8, 1948, the United States filed its motion to stay mandate in the Court of Appeals. The Court of Appeals granted the stay on February 11, 1948, thus retaining the impounded funds, $9,749,000, in the custody of the District Court.

The Supreme Court of the United States in *United States* v. *Cold Metal* denied a petition for certiorari on May 3, 1948, and denied a petition for rehearing on June 1, 1948.

The interlocutory order having provided that the funds impounded with the clerk of the District Court should "await further order of this Court," Cold Metal and the trustee, on June 2, 1948 (the day after the petition for rehearing was denied by the Supreme Court), filed a motion in the District Court in *United States* v. *Cold Metal* to permit

the withdrawal of these funds, which motion was resisted by the United States. Thereafter on June 16, 1948, the District Court entered an order requiring the clerk of the court to pay over the impounded funds, $9,749,000, to the trustee but not earlier than June 25, 1948. This ended the cancellation case.

On June 23, 1948 (2 days before the date on which the clerk was required to pay the impounded funds over to the trustee), the United States filed a complaint in the United States District Court for the Northern District of Ohio, Eastern Division, based upon the Royalty Adjustment Act, claiming that all of the funds impounded in *United States* v. *Cold Metal* were subject to the provisions of the Royalty Adjustment Act and certain royalty adjustment orders previously made thereunder, and that the United States and not Cold Metal or the trustee was entitled to the impounded funds. Each of the nine steel companies who had paid sums into the registry of the District Court as above set forth and the trustee and Cold Metal were made parties defendant. This case is hereafter referred to as *United States* v. *Youngstown*.

On the basis of the complaint and the motion for a temporary restraining order filed simultaneously therewith, the District Court in *United States* v. *Youngstown* on June 23, 1948, issued a temporary restraining order restraining the clerk from disbursing any part of the funds impounded in *United States* v. *Cold Metal*, $9,749,000, for a period of 10 days. This temporary restraining order was thereafter continued in full force and effect until the entry of an order by the Court of Appeals on July 21, 1948.

On July 6, 1948, the District Court in *United States* v. *Youngstown* held that the Royalty Adjustment Act had no application to the funds impounded with the clerk in *United States* v. *Cold Metal* and denied the motion of the United States for a preliminary injunction.

Upon the refusal of the District Court to grant a stay pending appeal, the United States made a similar application to the Honorable Florence E. Allen, Judge of the United States Court of Appeals for the Sixth Circuit. On July 21, 1948, Judge Allen, acting for the appellate court, entered an order conditionally denying the application and allowing the trustee to withdraw the impounded funds in *United States* v. *Cold Metal* but only on condition that the funds be deposited with the Federal Reserve Bank for safekeeping and investment and reinvestment in United States Treasury bills until final disposition of plaintiff's appeal in *United States* v. *Youngstown* and until further order of the appellate court.

In compliance with this order, the clerk of the District Court paid over to the trustee on July 26, 1948, the sum of $9,749,000 here involved which up to that time had been held in the registry of the

court in the case of *United States* v. *Cold Metal*. The trustee thereupon deposited the amount in the Federal Reserve Bank of Cleveland which retained these funds and invested them and the proceeds thereof in Treasury bills in accordance with the directions of the trustee until January 28, 1949.

On December 6, 1948, in *United States* v. *Youngstown*, the Court of Appeals for the Sixth Circuit decided that none of the funds impounded with the clerk in *United States* v. *Cold Metal* were subject to the Royalty Adjustment Act or the royalty adjustment orders made thereunder and affirmed the decision of the District Court denying the motion of the United States for preliminary injunction impounding funds.

On January 7, 1949, it appearing that the United States did not contemplate a review of the decision of the Court of Appeals, the Court of Appeals in *United States* v. *Youngstown* entered an order permitting the trustee to withdraw from the Federal Reserve Bank of Cleveland the entire amount of $9,749,000, and which is here involved, previously impounded with the clerk of the District Court in *United States* v. *Cold Metal*, free and clear of any restrictions.

On January 6, 1949 (the day before the release of the funds by the Court of Appeals), the collector of internal revenue for the eighteenth district of Ohio served on the Federal Reserve Bank of Cleveland a notice of levy asserting that internal revenue taxes and interest were due and owing from Cold Metal for the calendar year 1945. With the notice of levy were served two warrants of distraint and one notice of tax lien. On the same day the collector of internal revenue for the eighteenth district of Ohio served on the Federal Reserve Bank of Cleveland similar notice of levy, warrants of distraint, and notice of tax lien asserting that internal revenue taxes for the calendar year 1945 and interest were due and owing from the trustee as transferee of Cold Metal. By reason of the service of the notices of levy, warrants of distraint, and notices of tax lien, the trustee could not withdraw any part of the funds then on deposit in the Federal Reserve Bank.

On January 14, 1949, the Commissioner of Internal Revenue issued a statutory notice of deficiency to Cold Metal as to the year 1945. On the same date the Commissioner issued a statutory notice of deficiency to the trustee as transferee of the assets of Cold Metal. The notice of deficiency determined as a deficiency against the trustee as transferee of the assets of Cold Metal the same taxes as those determined against Cold Metal in the notice of deficiency addressed to it.

On January 28, 1949, the trustee paid to the collector of internal revenue $8,449,973.33 in full payment of tax and interest claimed by the collector to be due from the trustee as transferee of Cold Metal,

and simultaneously with such payment the Federal Reserve Bank of Cleveland turned over to the trustee the entire $9,749,000 it had received on July 26, 1948. The payment of the $8,449,973.33 was made possible only by the use of a part of the proceeds of the $9,749,000. Of the $8,449,973.33 paid to the collector of internal revenue as aforesaid, $1,237,176.68 represented interest to January 28, 1949, on the alleged deficiency for the year 1945. determined by the Commissioner. On March 5, 1949, petitioner as transferee of Cold Metal paid to the collector of internal revenue the sum of $69,216.33 as tax and $10,396.04 as interest on a deficiency in income tax assessed against Cold Metal for the year 1943.

On December 29, 1945, after the dissolution of Cold Metal and the transfer of its assets to the trustee, the trustee and Cold Metal executed two settlement agreements with Allegheny and Wallingford. These agreements were substantially identical in terms and granted to Allegheny and Wallingford licenses under patents '016 and '195 and other patents previously owned by Cold Metal, and further provided for the payment of $700,000 by Allegheny and $300,000 by Wallingford for past infringement of these patents.

Each of the agreements with Allegheny and Wallingford provided that the sum so to be paid would be paid to the trustee, but that in view of the interlocutory order in *United States* v. *Cold Metal*, this sum might be paid to the clerk of the District Court at the option of the payor, and further provided:

In the event that the payment is not made to said Clerk, it shall be made to the Trustee or its successors or assigns immediately upon any modification or revocation of said order permitting such payment be made.

Allegheny and Wallingford paid these sums into the registry of the District Court in *United States* v. *Thomas Steel*, hereinafter noted, on July 9, 1947.

On March 3, 1947, the United States brought suit in the District Court for the Northern District of Ohio, Eastern Division, to enforce the provisions of the order made under the Royalty Adjustment Act on December 29, 1944, fixing the reasonable rate of royalty under patents '016 and '195 at zero and joining as defendants the trustee, Cold Metal, and 25 corporations who were licensees or alleged to be licensees of Cold Metal or the trustee under patents '016 and '195. This case will hereafter be referred to as *United States* v. *Thomas Steel*.

On January 12, 1949, after it had been determined in *United States* v. *Youngstown* that the Royalty Adjustment Act and the orders made thereunder were not applicable to moneys resulting from the settlement of claims for patent infringement, an order was entered in *United States* v. *Thomas Steel* permitting the withdrawal of the sums

of $700,000 and $300,000 deposited on July 9, 1947, by Allegheny and Wallingford, respectively; and on January 12, 1949, the sums of $700,000 and $300,000 were paid to the trustee by the clerk of the District Court. These sums had been retained in the registry of the District Court continuously from the time of their deposit on July 9, 1947, until January 12, 1949, when they were paid to the trustee.

After the filing of the complaint in *United States* v. *Thomas Steel* on March 3, 1947, various licensees who were parties defendant paid into the registry of the District Court during the years 1947, 1948, and 1949 sums aggregating $6,964,695.92 as the amount of royalties which they admitted to be due under license agreements. These sums were in addition to the aggregate payment by Allegheny and Wallingford of $1 million.

On August 23, 1949, a pretrial consent order was entered by the District Court in *United States* v. *Thomas Steel* which provided that 15 per cent of the royalties on production up to and including August 31, 1945, and 90 per cent of the royalties on production thereafter under license agreements there involved (except those of McLouth Steel Corporation and United Engineering & Foundry Company) were to be considered wholly outside of the operation of the Royalty Adjustment Act and any orders issued thereunder. In pursuance of the pretrial order, the clerk of the District Court on August 23, 1949, paid to the trustee the sum of $3,424,278.58 out of the registry. Of the amount so paid, $2,907,915.72 represented royalties on production for the period commencing September 1, 1945, and ending January 14, 1947, and was 90 per cent of the amount of royalties voluntarily paid into court for this period. The remainder of the amount so paid, to wit, $516,362.82, represented royalties on production for the period ending August 31, 1945, and was 15 per cent of the royalties voluntarily paid into court with respect to such production. The pretrial consent order and the percentages agreed to therein were not the result of any accounting or mathematical determination but merely a recognition by the parties of the practical impossibility of determining to what extent the production of the various licensees represented Government end use.

As a result of litigation commenced by Cold Metal against McLouth Steel Corporation, hereafter referred to as McLouth, in 1940, and continued by the trustee subsequent to December 29, 1945, and a decision of the Court of Appeals for the Sixth Circuit in that case on October 4, 1948, there was paid to the trustee on April 5, 1949, from the registry of the District Court in Michigan $207,909.27, all of which represented royalties due from McLouth for the period ending March 31, 1942, and interest thereon to approximately the time of payment. As of December 29, 1945, McLouth was resisting Cold Metal's acts, and disputed its liability.

Pursuant to the decision of the Court of Appeals in the litigation between the trustee and McLouth, an agreement of settlement was made in 1949 between McLouth and the trustee covering the royalties on McLouth's cold mills subsequent to March 31, 1942. As a result of this settlement agreement $128,306.91 was paid to the trustee by McLouth on August 4, 1949, and $87,515.43 was paid to the trustee out of the registry of the court in the *Thomas Steel* case on October 4, 1949, making a total payment of $215,822.34. The amount of $153,-045.63 represented royalties and interest thereon on production subsequent to December 29, 1945, and the balance of $62,776.71 represented royalties and interest thereon on production up to and including December 29, 1945. An additional $194,048.82 was paid by McLouth into the registry of the District Court in the *Thomas Steel* case in 1949 and was held there until the dismissal of the Government's complaint on December 28, 1955.

During the year 1949, five of the nine steel companies which had entered into settlement and license agreements with Cold Metal and the trustee on December 29, 1945, or in 1946, paid into the registry of the District Court in *United States* v. *Youngstown*, as royalties on production subsequent to December 31, 1945, the aggregate sum of $843,-888.78. As a result of the pretrial consent order which was entered by the District Court in *United States* v. *Youngstown*, heretofore mentioned, the clerk of the District Court on various dates from August 23 to October 26, 1949, paid 90 per cent of the amount deposited by each of the companies to the trustee, making an aggregate payment of $759,499.90.

During the year 1949 the following additional amounts were paid to the trustee by the persons and for the purpose indicated:

| | |
|---|---:|
| Broken Hills Proprietary Co., for royalties accruing in 1948 and 1949 | $1,631.03 |
| Olin Industries, Inc., for royalties under the license agreement of Feb. 21, 1946 | 8,700.00 |
| Cold Metal Products Company, dividend of $1 per share of 200 shares of stock | 200.00 |
| United States, interest on Treasury bills | 57,324.64 |
| Interest paid by purchasers of Products Company stock | 13,854.95 |

From the time petitioner was created on December 28, 1940, until December 31, 1944, petitioner's sole activities consisted of: (a) Receiving 151 shares of Cold Metal stock as contributions from Leon A. Beeghly; (b) receiving dividends on these Cold Metal shares owned by it; (c) disbursing from its income for the charitable purposes described in the trust agreement, the sum of $281,111.44; and (d) carrying on incidental activities such as filing returns on Form 990 and paying trustee's fees.

In addition to the above activities, petitioner's activities during the year 1945 consisted of purchasing the remaining 1,849 shares of Cold Metal, dissolving Cold Metal and acquiring its assets in liquidation; selling the stock of the Products Company, paying $200 per share to the selling shareholders of Cold Metal out of the proceeds of Products Company stock and making payments on the obligations of Cold Metal which it had assumed under the purchase agreement; and executing settlement agreements with various steel companies as hereinbefore related.

During the period January 1, 1946, to December 31, 1948, in addition to activities similar to those conducted prior to 1945 as set out above, petitioner's activities consisted of collecting funds due from the Products Company stock; collecting royalties not affected by the cancellation case, the *Thomas Steel* case, the *McLouth* case, or the royalty adjustment notices or orders; paying such of the obligations of Cold Metal which it had assumed for which it had funds available; defending, carrying on, settling, instituting, and prosecuting actions involving or relating to the assets received upon the liquidation of Cold Metal; selling some small holdings of miscellaneous securities received on liquidation of Cold Metal; and receiving $9,749,000 from the registry of the court in the cancellation case and paying same to Federal Reserve Bank for safekeeping pursuant to an order of the Court of Appeals in the *Youngstown* case and directing the investment of the same.

During the year 1949, petitioner's activities consisted of: (a) Collecting funds due it from the sale of Products Company stock; (b) collecting accounts receivable acquired on the liquidation of Cold Metal; (c) collecting royalty and infringement payments released from impound in the *Youngstown*, *Thomas Steel*, and *McLouth* cases, and receiving from the Federal Reserve Bank the proceeds from the funds originally impounded in the cancellation case; (d) receiving dividends on Products Company stock; (e) paying taxes asserted to be due from it as transferee of Cold Metal for which warrants of distraint and notices of levy had been issued against it; (f) causing petitions to be filed in the Tax Court contesting the deficiency determined against Cold Metal and against petitioner as transferee of Cold Metal for the year 1945; (g) making final payment of liabilities of Cold Metal assumed upon liquidation of that corporation; (h) making payments of $2,429,200 under the contracts for the purchase of Cold Metal stock; (i) defending, carrying on, settling, instituting, and prosecuting actions involving or relating to the assets received from Cold Metal on the liquidation of that corporation; (j) disbursing

$66,300 for the charitable purposes described in the trust agreement; and (k) carrying on incidental activities such as filing information returns on Form 990, paying trustee's, accountants', and attorneys' fees, paying other deficiencies in taxes determined against Cold Metal, and investing and reinvesting funds in Government securities.

From the time it was created through the year 1949, the trust never engaged in business activities except as mentioned above. During the period January 1, 1945, through December 31, 1949, the trust distributed a total of $90,250 for the charitable purposes described in the trust agreement.

As a result of protracted litigation begun by Cold Metal in 1934 and continued by the trustee after December 29, 1945, the trust recovered royalties from United Engineering & Foundry Company in the amount of $387,650 plus interest of $55,718.01, making a total recovery of $443,368.01.

Since December 29, 1945, the trustee has made settlements with and received payments from various other infringers as follows: Ford Motor Company, $300,000; Acme Steel Company, $225,000; Thompson Wire Company, $95,000; Universal-Cyclops Steel Company, $20,000.[2]

The royalties and interest thereon collected by the trustee after December 29, 1945, through the *Thomas Steel* and *Youngstown* cases are as follows:

| Date | Royalties and interest |
|---|---|
| *Thomas Steel* case: | |
| Aug. 23, 1949 | $3,424,278.58 |
| Mar. 22, 1954 | 103,139.29 |
| Apr. 26, 1954 | 158,406.29 |
| Dec. 28, 1955 | 3,904,925.42 |
| *Youngstown* case: | |
| Aug. 23, 1949 | 530,353.39 |
| Aug. 23, 1949 | 61,798.32 |
| Sept. 22, 1949 | 14,095.77 |
| Oct. 12, 1949 | 106,103.55 |
| Oct. 26, 1949 | 47,148.87 |
| Dec. 15, 1950 | 413,707.50 |
| Mar. 10, 1952 | 33,995.46 |
| Dec. 28, 1955 | 152,245.91 |
| Total | 8,950,198.35 |

Of this amount $4,229,276.06 was due and payable on December 31, 1945.

---

[2] We are unable to determine from the record just when these payments and the payment from United Engineering & Foundry Company were received, but we assume that they are included in the stipulated totals for the proper year as set out elsewhere in these Findings of Fact.

In addition to the royalties voluntarily paid by the licensees into the registry of the court in the *Thomas Steel* and *Youngstown* cases and the amounts recovered from McLouth and United Engineering & Foundry Company, the trustee has recovered by agreement from several licensees since December 28, 1955, additional amounts for royalties or interest or both as follows:

| | |
|---|---|
| National Steel Corporation | $975,000.00 |
| United States Steel Corporation | 85,000.00 |
| Inland Steel Co | 55,000.00 |
| Olin Industries, Inc | 20,100.00 |
| Broken Hills Proprietary Co | 6,089.74 |
| Elliott Brothers Steel Co | 6,000.00 |
| Thomas A. Edison Co | 2,150.00 |
| Total | 1,149,339.74 |

At the time of trial there were still pending in the *Thomas Steel* and *Youngstown* cases claims against eight different licensees for additional royalties and interest thereon, and there were still pending in various Federal courts suits against infringers of the Steckel patents in which substantial amounts are claimed. The following amounts consist of estimates of possible recoveries made by petitioner's patent counsel, assuming that petitioner will be successful in each of these suits:

| | *Royalties* | *Interest* |
|---|---|---|
| United States Steel Corporation | $723,728.26 | $1,251,230.00 |
| Crucible Steel Co. of America | 28,653.75 | 34,454.00 |
| Wheeling Steel Corporation | 224,744.67 | 167,129.54 |
| National Standard Co | 2,507.81 | 4,556.00 |
| Associated Spring Co | 80,466.12 | 78,266.00 |
| International Nickel Co | 19,132.28 | 20,334.00 |
| Pittsburgh Steel Co. (formerly Thomas Steel) | ---------- | 20,284.00 |
| American Brass Co | ---------- | 3,150.00 |
| Total | 1,079,232.89 | 1,579,403.54 |

As to the infringers:

| | |
|---|---|
| Aluminum Corp. of America | $5,000,000 |
| E. W. Bliss Co | 2,400,000 |
| Revere Copper & Brass Co | 500,000 |
| Greer Steel Co | 200,000 |
| Granite City Steel Co | 50,000 |
| Bopp Steel Co | 40,000 |
| Total | 8,190,000 |

On or about April 3, 1953, after entry of a final order by this Court in the 1945 tax case (*Cold Metal Process Co.*, 17 T.C. 916), the Treas-

urer of the United States paid to petitioner the sum of $8,449,973.33, plus interest totaling more than $2 million, representing the amount paid by petitioner to the collector in 1949 on the asserted tax liability for 1945.

On or about January 11, 1951, the Commissioner issued to Cold Metal a statutory notice of deficiency determining a deficiency of $5,550,140.33 for income taxes for the year 1949. On the same day a statutory notice of deficiency was issued to petitioner, as transferee, determining the same deficiency. On or about April 6, 1951, Cold Metal and petitioner filed petitions in the Tax Court of the United States. After the decisions of the Tax Court in the above-mentioned cases (25 T.C. 1333) and a decision of the Court of Appeals for the Sixth Circuit reversing in part the decisions of the Tax Court (247 F. 2d 864) and remanding these cases to this Court, final decision was entered in each of the cases by this Court on December 4, 1957, determining that none of the payments received in 1949 were taxable to Cold Metal, it having been dissolved, and that there was no deficiency in income tax due from Cold Metal for the year 1949 and no liability of petitioner as transferee of Cold Metal, and that petitioner as transferee had overpaid tax and assessed interest for that year in the total amount of $6,578,740.99. On or about February 17, 1958, the director of internal revenue at Cleveland, Ohio, applied the overpayment of taxes and interest by crediting the overpayment of $6,578,740.99 plus interest accrued thereon in the sum of $1,907,834.89, or a total amount of $8,486,575.88, upon the deficiency determined against petitioner in the notice of deficiency which gives rise to this proceeding issued under date of July 22, 1954. This amount was apportioned between income tax and interest thereon from March 15, 1950, to February 17, 1958, as follows:

| | |
|---|---:|
| Income tax | $5, 752, 328. 62 |
| Assessed interest | 2, 734, 247. 26 |
| Total | 8, 486, 575. 88 |

No part of the $8,486,575.88 has been refunded.

On January 25, 1956, petitioner paid to the director of internal revenue, Cleveland, Ohio, the sum of $2,959,359.48 to apply upon the deficiency here involved plus the sum of $1,040,640.52 as interest on said tax from March 15, 1950, to January 25, 1956, making a total payment on this date of $4 million. No part of the sums totaling $4 million has been refunded.

Each of the contributions made by petitioner during the years 1941 to 1949, inclusive, was for a charitable purpose within the meaning of

the original trust instrument and no part of the activities, principal, or income of the petitioner has been devoted in any way to carrying on propaganda or otherwise attempting to influence legislation and petitioner has not intervened in any political campaign on behalf of any candidate for public office.

The assets received by petitioner upon the dissolution and liquidation of Cold Metal on December 29, 1945, including patents, rights of action, license agreements, accrued royalties, and accrued interest, had on that date a total adjusted basis in the hands of petitioner in the amount of $12 million. A list of those assets and the adjusted basis of each of said assets in the hands of petitioner immediately after its receipt by petitioner from Cold Metal is as follows:

| Assets acquired from Cold Metal | Adjusted basis | Basis factor [1] |
|---|---|---|
| Cash | $60, 445. 20 | 100 |
| Deposits, claims, etc | 6, 915. 16 | 100 |
| Common stock Cold Metal Products Co | 1, 250, 000. 00 | 100 |
| Follansbee Steel Co | 244. 00 | 100 |
| Infringement damage claims against: | | |
| American Rolling Mill Corp | 1, 564, 875. 00 | 65 |
| Bethlehem Steel Corp | 1, 385, 865. 00 | 65 |
| Crown Cork & Seal Co | 130, 455. 00 | 65 |
| Jones & Laughlin Steel Corp | 897, 390. 00 | 65 |
| Wheeling Steel Corp | 1, 068, 210. 00 | 65 |
| Youngstown Sheet & Tube Co | 803, 205. 00 | 65 |
| Allegheny-Ludlum Steel Corp | 455, 000. 00 | 65 |
| Wallingford Steel Co | 195, 000. 00 | 65 |
| Inland Steel Corp | 390, 000. 00 | 65 |
| Signode Steel Strapping Co | 21, 150. 00 | 45 |
| Crucible Steel Co | 49, 500. 00 | 45 |
| Republic Steel Corp | 750, 000. 00 | 12. 5 |
| Defense Plant Corp | 125, 000. 00 | 12. 5 |
| Superior Steel Corp | 125, 000. 00 | 12. 5 |
| Ford Motor Co | 37, 500. 00 | 12. 5 |
| Acme Steel Co | 28, 125. 00 | 12. 5 |
| Universal-Cyclops Steel Corp | 2, 500. 00 | 12. 5 |
| Thompson Wire Co | 11, 875. 00 | 12. 5 |
| Aluminum Corporation of America | 625, 000. 00 | 12. 5 |
| E. W. Bliss Co | 300, 000. 00 | 12. 5 |
| Revere Copper & Brass Co | 62, 500. 00 | 12. 5 |
| Greer Steel Co | 25, 000. 00 | 12. 5 |
| Granite City Steel Co | 6, 250. 00 | 12. 5 |
| Bopp Steel Co | 5, 000. 00 | 12. 5 |
| Royalties received during period Dec. 29, 1945, through Dec. 31, 1959: | | |
| Royalties having nongovernment end use—royalties and interest thereon accrued to Dec. 29, 1945 | 396, 042. 58 | 25 |
| Royalties accruing subsequent to Dec. 29, 1945 | 607, 160. 46 | 15 |
| Royalties having Government end use— | | |
| Royalties and interest thereon accrued to Dec. 29, 1945 | 528, 997. 48 | 12. 5 |
| Royalties accruing subsequent to Dec. 29, 1945 | 44, 974. 85 | 10 |
| Royalties to be received subsequent to 1959 | 40, 820. 27 | 5 |
| Total | 12, 000, 000. 00 | -------- |

[1] The parties have agreed that upon the realization by petitioner on each of said assets in the form of cash or its equivalent, petitioner is entitled to consider the portion of such realization represented by the percentage figures in column 3 above as a recovery of adjusted basis, and that after the entire adjusted basis of any asset has been recovered all subsequent receipts in respect to such assets shall be considered 100 per cent as income. Should petitioner alternatively fail to recover any portion of the adjusted basis of any asset it is agreed that petitioner will be entitled to an ordinary deduction in the amount of the unrecovered portion of said basis in the year in which it is finally determined that petitioner is not entitled to any further recovery. The adjusted basis of any asset received by petitioner from Cold Metal and not listed above is zero.

A list of the amount of cash receipts realized by petitioner in the year 1949, the sources of those receipts, and the adjusted basis of the claims upon which the cash was received, is as follows:

1949

| Source of cash receipt | Amount realized | Basis factor | Adjusted basis |
|---|---|---|---|
| Infringement damage claims against: | | | |
| American Rolling Mills Co. | $2,407,500.00 | 65 | $1,564,875.00 |
| Bethlehem Steel Co. | 2,132,100.00 | 65 | 1,385,865.00 |
| Crown Cork & Seal Co. | 200,700.00 | 65 | 130,455.00 |
| Jones & Laughlin Steel Corp. | 1,380,600.00 | 65 | 897,390.00 |
| Wheeling Steel Corp. | 1,643,400.00 | 65 | 1,068,210.00 |
| Youngstown Sheet & Tube Co. | 1,235,700.00 | 65 | 803,205.00 |
| Allegheny-Ludlum Steel Corp. | 700,000.00 | 65 | 455,000.00 |
| Wallingford Steel Co. | 300,000.00 | 65 | 195,000.00 |
| Inland Steel Corp. | 600,000.00 | 65 | 390,000.00 |
| Signode Steel Strapping Co. | 39,000.00 | 45 | 17,550.00 |
| Crucible Steel Corp. | 110,000.00 | 45 | 49,500.00 |
| Superior Steel Co.[1] | | | 125,000.00 |
| Royalty claims against: | | | |
| McLouth Steel Corp.— | | | |
| Royalties and interest to Dec. 29, 1945 | 261,014.25 | 25 | 65,253.56 |
| McLouth Steel Corp.— | | | |
| Royalties subsequent to Dec. 29, 1945 | 57,552.46 | 15 | 8,632.87 |
| McLouth Steel Corp.— | | | |
| Interest subsequent to Dec. 29, 1945 | 17,649.47 | | |
| Various defendants in *United States* v. *Thomas Steel Co., et al.*— | | | |
| Royalties and interest to Dec. 29, 1945 | 1,227,405.64 | 25 | 306,851.41 |
| Royalties subsequent to Dec. 29, 1945 | 2,271,749.73 | 15 | 340,762.46 |
| Interest subsequent to Dec. 29, 1945 | 12,638.64 | | |
| Various defendants in *United States* v. *Youngstown Sheet & Tube Co., et al.*— | | | |
| Royalties and interest to Dec. 29, 1945 | | | |
| Royalties subsequent to Dec. 29, 1945 | 755,367.12 | 15 | 113,305.07 |
| Interest subsequent to Dec. 29, 1945 | 4,132.78 | | |
| Broken Hills Proprietary Co. | 1,631.03 | | |
| Olin Industries, Inc. | 8,700.00 | | |
| Total [2] | 15,366,841.12 | | 7,916,855.37 |
| Total basis absorbed in 1949 | | | 7,916,855.37 |
| Remaining basis to be absorbed in years subsequent to 1949 | | | 4,083,144.63 |
| Total adjusted basis of assets received from Cold Metal | | | [3] 12,000,000.00 |

[1] Case against Superior Steel Co. was dismissed without any recovery in 1949.
[2] Does not include dividend income in amount of $200 or interest income in the net amount of $71,179.59 which petitioner realized in 1949.
[3] The parties have agreed that the amounts realized by petitioner upon liquidation of each of the assets listed above shall not be considered as proceeds from the sale or exchange of assets and petitioner shall not be entitled to treat gains or losses arising therefrom as capital gains or losses.

During the year 1949 petitioner dismissed with prejudice its suit against Superior Steel Corporation for an infringement of patents. By reason of the dismissal of this action with prejudice the claim against Superior Steel Corporation became worthless in 1949.

During the period of December 29, 1945, to November 5, 1953, petitioner made the following disbursements:

| Disbursements | Amounts |
|---|---|
| Charitable contributions | $306,793.00 |
| Legal expense | 2,293,965.79 |
| To former Cold Metal stockholders | [1] 5,287,500.00 |
| Retirement of Cold Metal dividend notes | 123,710.87 |
| Repayment of loan from Products Company | 586,034.87 |
| Accounting services | 606,799.67 |
| Court reporting | 26,583.45 |
| Expert witnesses | 41,312.95 |
| Trustee's fees | 55,419.77 |
| Purchase of securities (gross) | [2] 38,807,109.47 |
| Deposits on potential income tax liability | 15,108,326.69 |
| Miscellaneous | 39,881.42 |

[1] Of this amount $4,388,500 was paid to the Steckel group in payment of the entire balance due on their stock; and $899,000 was paid to the Beeghly group.
[2] This includes numerous reinvestments of funds received on maturing short-term Government bonds and notes.

Before application of the provisions of section 162(a) and without considering any net operating loss deduction to which petitioner might be entitled, petitioner's gross income and net income in 1949 were as follows:

| | | |
|---|---|---|
| Receipts on assets received in liquidation of Cold Metal | | $15,366,841.12 |
| Less: Basis in such assets | | 7,791,855.37 |
| Net receipts | | 7,574,985.75 |
| Dividends | | 200.00 |
| Interest | | 71,179.59 |
| Total income | | 7,646,365.34 |
| Less: | | |
| Deductions other than under sec. 162(a) and loss on Superior Steel case | $1,986,696.98 | |
| Loss on Superior Steel case | 125,000.00 | |
| | | 2,111,696.98 |
| Net income before application of sec. 162(a) | | 5,534,668.36 |

The stipulated facts are found as stipulated and are incorporated herein by this reference.

OPINION.

*Issue 1.*

Section 101(6), I.R.C. 1939, provides as follows:

The following organizations shall be exempt from taxation under this chapter—

*       *       *       *       *       *       *

(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;

Petitioner argues that it was organized exclusively for charitable purposes, that it has been at all times operated exclusively for charitable purposes and that the transaction by which it purchased 1,849 shares of Cold Metal stock in 1945 was consistent with the operation of the trust exclusively for charitable purposes, that no part of petitioner's net earnings inured to the benefit of any private shareholder or individual because the transaction by which petitioner purchased the Cold Metal stock was highly beneficial to the trust, that no part of its activities was devoted to carrying on propaganda or otherwise attempting to influence legislation, and that it is, therefore, exempt from taxation under the specific terms of section 101(6). Respondent does not question that petitioner was organized and operated prior to December 28, 1945, exclusively for charitable purposes or that no

part of petitioner's activities was devoted to carrying on propaganda or otherwise attempting to influence legislation. However, respondent does contend that at the time petitioner entered into the transaction for the purchase of 1,849 shares of Cold Metal stock in 1945, and at all times thereafter, petitioner was not operated exclusively for charitable purposes, and that a part of the net earnings of petitioner inured to the benefit of the stockholders who sold their stock in Cold Metal to the trustee.

We agree with most of the arguments of petitioner but in the final analysis have found that it was not exempt from income tax under section 101(6) for the year 1949, because we do not think that when the trust was utilized as a last-resort vehicle to culminate the plan of the Cold Metal shareholders to settle the infringement claims against the steel companies in the year 1945 in such a manner as to permit the stockholders to receive the proceeds thereof as capital gains, and thereafter during the period of time required to carry out this plan, the trust was being operated *exclusively* for charitable purposes. In fact, we think that although the ultimate purpose of the trust to benefit charities may have remained unchanged by this transaction, nevertheless, the primary objective of the trust entering into this transaction was for the benefit of stockholders of Cold Metal Process Company, with the objective of ultimately benefiting charities running a poor second, and that when the trust was utilized for such a purpose it fell without the scope of both the language of section 101(6) and the congressional intent in enacting this exemption provision.

While the instrument creating an organization may be conclusive as to the purpose for which it was organized, it does not control the fact as to whether it was operated exclusively for such purpose. Whether it was so operated is to be determined from the facts and circumstances in each particular case. *Cummins-Collins Foundation*, 15 T.C. 613.

There can be no question from the evidence in this case that when the steel companies insisted that any settlement they were willing to make had to be completed prior to the end of 1945 and they also refused to buy the Cold Metal stock in consummation of a settlement, petitioner was used as a last-resort means of effecting a settlement in a manner whereby the stockholders of Cold Metal would get the proceeds therefrom as capital gains. Beeghly so testified and this is not denied by petitioner on brief. Instead petitioner strongly urges that a tax savings' motive on the part of the stockholders cannot operate to deny tax-exempt status to the trust so long as the transaction was bona fide and the trustee adequately protected the trust. Petitioner then attempts to show that the transaction was highly beneficial to the trust and was a sound investment to produce income for the use of

charities, and that its activities after the purchase of the Cold Metal stock were simply activities required to realize on the assets acquired and the trust was therefore operated exclusively for the benefit of charities. Petitioner relies principally on *Alan Levin Foundation*, 24 T.C. 15, and *Ohio Furnace Co.*, 25 T.C. 179, in support of its position.

We are not convinced that the purchase of the remaining shares of Cold Metal by the trust under the circumstances existing at the end of the year 1945 and on the terms provided could have been considered to be a highly beneficial transaction for the trust at that time. It may have been, as claimed by petitioner, a last-resort method by which the trust could protect the corpus it already had. It has turned out to be a good investment for the trust, particularly if the trust is tax exempt, but it is highly doubtful that even the most optimistic of those involved expected the results that have been obtained. But be that as it may, it is clear that the trust was brought into this transaction for the primary purpose of permitting the stockholders of Cold Metal to settle with the steel companies for the amount agreed upon in such a manner that they would have something left after taxes, and we think that in entering into the transaction for that purpose the trust was being operated other than exclusively for charitable purposes within the intent of the statute, and that when it continued to be used in the year 1949 in carrying out this transaction, it was also being operated for other than exclusively charitable purposes.

We draw no unfavorable inferences from the desires of the Cold Metal stockholders to get their money at capital gains rates, but we cannot overlook the fact that the trust was utilized to accomplish that objective. The prime mover in the transaction was Beeghly who was not only a large shareholder in Cold Metal but had also created the trust and was a director of the trustee. The evidence indicates that no one in the bank gave any serious independent consideration to the advisability of the trust going into this transaction prior to the time the agreements were signed, but it is evident that the trustee agreed to go along on behalf of the trust because Beeghly recommended it and he was the one primarily interested in the trust. While it is true that six of the steel companies had agreed not to seek the return of the $9 million they agreed to pay, the trustee knew or could have known that the Government had refused to drop its efforts to have the patents canceled and there was no assurance that the trust would ever actually realize anything for itself. On the other hand, it agreed to assume the burden of carrying on the litigation to collect the royalties and infringment claims, which had already proved costly and time consuming, to assume the debts of Cold Metal, and to run the risk of losing its tax-exempt status. It subordinated its own right to receive anything to the rights of the other stockholders to receive payment in

full for their stock. It is true that the trust would take all amounts received after payment of the above obligations and that it could probably be foreseen that this might amount to a rather large sum if all the claims were pressed to a successful conclusion. But nevertheless it was a very risky and speculative venture and one which we do not believe a trustee would enter into unless there was some other purpose or objective in doing so. That purpose was to bail the Cold Metal stockholders out at capital gains rates. If this was an independent motive on the part of the trustee, we do not think it was a use of the trust for exclusively charitable purposes. On the other hand, if the tax savings' motive was solely that of Beeghly and his associates, we think that motive must be imputed to the trustee because of Beeghly's dominant position with respect to the trust, without which we do not think the trustee would have entered into this transaction.

We think the cases relied on by petitioner are distinguishable on their facts.

In *Alan Levin Foundation, supra,* there was no claim that the trust was organized and used to benefit its creator or any other private individual. The creator of the trust bought the American Distillery Company stock for the purpose of selling it to the trust and letting the trust realize the income from sale of the whisky, which income, after payment of notes given in payment for the stock, all had to be used for charitable purposes. The creator of the trust realized no gain or other benefit on the sale of his stock—he simply got his money back. The trust took no risk of losing anything it already had. The principal question involved in that case was whether the trust was organized and operated primarily to engage in the wholesale liquor business. We held that it was not—that its activities in that field were limited, temporary, and incidental to the ownership of the stock, and that the creators had simply taken advantage of what appeared to be a unique situation in order to provide the initial funds for a charitable foundation. Our conclusion in the present case is not predicated on the proposition that petitioner was utilized for the primary purpose of carrying on a commercial business activity, but rather that it was utilized during the year in question, in a large part at least, to benefit the Cold Metal stockholders.

In *Ohio Furnace Co., supra,* a boys' school organized a nonprofit, nonstock corporation, the Shattuck-Ohio Foundation, and donated $1,000 as its original capital. Its purpose was to receive property by gift or otherwise and administer same and make grants of principal or income to nonprofit corporations organized for educational purposes. The foundation purchased all the stock of Ohio Furnace Company, an operating commercial enterprise, from its three stock-

holders, none of whom was connected with the school, in what we found to be an arm's-length transaction at a fair and reasonable price. The foundation then organized Ohio Furnace Company, Inc., and acquired all of its stock. The purpose of this company was stated in part to be to provide income and property for the Shattuck-Ohio Foundation, and its charter provided that its entire capital stock should at all times be owned by the foundation and its entire net earnings should inure to the benefit of the foundation and should be distributed to said foundation from time to time; and no part of its net earnings should inure to the benefit of any private shareholder or individual. In a reorganization, the new furnace company acquired all the assets and going business of the old furnace company, subject to its liabilities, and thereafter engaged in the business of selling and distributing heating and lighting equipment. Under the terms of the purchase agreement with the former stockholders of the old furnace company, the purchase price of the stock was to be paid out of the earnings of the business and not more than $5,000 of the earnings could be used for charitable purposes in any year until the stock was paid for in full. During the taxable years no disbursements were made for educational purposes and most of the earnings of the business, except a small amount retained by the company as working capital and about $6,700 distributed to the foundation and retained by it as a cash balance, were used to make payments on the principal and interest on the notes given for the stock.

We held in that case that both the foundation and the new furnace company were exempt from tax. With reference to the foundation we found that it was organized exclusively for charitable purposes, that it had not indulged in propaganda or influencing legislation, and that no part of its net income had inured to the benefit of the former stockholders. We also held in *Ohio Furnace* that the use of income of the foundation for purchase of the furnace company stock was for the sole purpose of paying for an investment, all of the income from which must be used for the prescribed educational purposes, and, therefore, the foundation was operated exclusively for charitable purposes. But in that case there was no connection between the sellers and the foundation and there was no urgent necessity for the sellers to sell. They were willing to sell their stock to anyone who would pay a reasonable price therefor, and they negotiated an arm's-length agreement of sale with the foundation. The foundation made a sound investment which was not speculative and it ran no risk of losing anything that might otherwise be used for educational purposes. It was not directly engaged in a business activity.

With respect to the new furnace company, its entire income, except that retained in the business, was distributed to the foundation and

the only question was whether it was nonexempt because it was a "feeder organization" engaged in a commercial business enterprise. This Court adhered to its views on this question as set forth in *C. F. Mueller Co.*, 14 T.C. 922, revd. 190 F. 2d 120 (C.A. 3, 1951); *Joseph B. Eastman Corporation*, 16 T.C. 1502; *Donor Realty Corporation*, 17 T.C. 899, but found the corporation exempt under the specific language of section 302(d) of the Revenue Act of 1950, as added by section 601 of the Revenue Act of 1951, which provided that an organization should not be denied exemption from taxation under section 101 on the ground that it is carrying on a trade or business for profit when all of the net earnings therefrom must inure to the benefit of certain types of educational organizations. Obviously, our reason for finding the furnace company exempt can have no application here.

We relied on *Ohio Furnace Co., supra*, and used similar reasoning in holding that the corporation organized for the benefit of New York University, which acquired the stock of a group of companies in the leather business, liquidated them and operated the business, was exempt under section 101(6) in *Estate of Ernest G. Howes*, 30 T.C. 909, affd. 267 F. 2d 382 (C.A. 1, 1959). There the corporation was engaged directly in the business activity and its own earnings were used to pay the purchase price for the stock, but there was no connection between the sellers and New York University and we found the transaction had no other purpose so far as the corporation was concerned than an investment to provide income for educational purposes. The corporation was not denied exemption because it engaged directly in a trade or business for profit under the same section 302(d) of the Revenue Act of 1950.

*A. Shiffman*, 32 T.C. 1073, recently decided for petitioner by this Court, is also readily distinguishable from this case. In that case the basic issue was whether a debt-financed charitable foundation should be denied exempt status merely because it used the major portion of its net income from rental property during the first 5 years of its existence to retire the initial indebtedness incurred in purchasing the property. The foundation was not used for any purposes of the creator or for any other than exclusively charitable purposes.

We have considered carefully all the cases cited and relied on by petitioner in support of its contention. However, we find that all of them are distinguishable from this case, either on fact or in principle, on this particular point.

The use of the word "exclusively" in section 101(6) must be given effect. *Ralph H. Eaton Foundation* v. *Commissioner*, 219 F. 2d 527 (C.A. 9, 1955), affirming a Memorandum Opinion of this Court; *United States* v. *Community Services*, 189 F. 2d 421 (C.A. 4, 1951).

As said by Mr. Justice Murphy in *Better Business Bureau* v. *United States*, 326 U.S. 279, 283:

This plainly means that the presence of a single noneducational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes.

Applying that principle to the facts in this case, we find that when petitioner entered into this transaction in 1945 and when it was utilized in 1949 in carrying out the transaction it was being operated for two purposes: (1) To provide the Cold Metal stockholders with a vehicle by which they could settle with the steel companies and realize whatever receipts might be obtained from royalties and infringement claims on the patents, up to $11,131,000, as capital gains; and (2) to build up a fund to be used for charitable purposes. We need not decide which purpose was the dominant one. Suffice it to say that both purposes were "substantial"—and at the time the first-mentioned purpose was by far the more urgent. To permit an organization utilized and operated in part for such a purpose to retain its exempt status would do violence to both the language of the statute and the intent of Congress in granting the exemption, and would encourage the use of so-called charitable organizations to accomplish unrelated business transactions for their creators.

We hold that petitioner was not exempt from taxation in 1949.

In connection with this issue we have considered all of respondent's additional arguments as to why petitioner is not exempt from tax under section 101(6). These include an attack on the bona fides of the transaction whereby the trust acquired the remaining shares of Cold Metal stock and after dissolution sold the Products Company stock to Beeghly and his associates at an inadequate price; the argument that petitioner was a "feeder organization" and as such its unrelated business income was subject to tax; and that petitioner was not exempt under section 101(6) after December 28, 1945, and during the year 1949 because at least a part of its net earnings inured to the benefit of Beeghly and his associates because (a) part of petitioner's income in 1949 was used to pay former Cold Metal stockholders for their stock, (b) Products Company was permitted to use the Steckel patents royalty free after the trust sold the Products Company stock, and (c) petitioner paid all legal fees incurred in the negotiations with the steel companies for sale of the Cold Metal stock, which negotiations were conducted in part at least for the benefit of the individual stockholders. We do not pass on any of these arguments because it is not necessary in view of our conclusion on this issue expressed above. However, we do suggest that the bona fides and validity of the original transaction has already been decided by this Court and the Court of Appeals in the earlier proceeding against Cold Metal Process Com-

pany, reported in 25 T.C. 1333 and 247 F. 2d 864 wherein we stated, and the Court of Appeals agreed, that "it cannot be said that the Trustee was in effect the agent of Cold Metal or that the sale of the stock to the Trustee lacked substance."

### Issue 2.

Petitioner argues that even if the trust is not exempt from tax under section 101(6), it is nevertheless entitled to deduct under section 162(a) an amount at least equal to its net income as otherwise determined.

Section 162(a), as applicable to the year 1949, provided that the net income of a trust shall be computed in the same manner as that of an individual except that in lieu of the deduction for charitable contributions allowed to individuals under section 23(o), a trust shall be entitled to deduct—

any part of the gross income, without limitation, which pursuant to the terms of the * * * deed creating the trust, is during the taxable year paid or permanently set aside for the purposes and in the manner specified in section 23(o), or is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, * * *

This provision, in substantially the same form as the first clause quoted above, has been in the revenue laws since the Revenue Act of 1918 [3] and would appear to be complementary of the provisions, such as section 101 of the 1939 Code, which exempt charitable corporations, foundations, etc., from tax altogether. Although the fund or foundation may not be organized and *operated exclusively* for charitable purposes, as we have found to be the case here, and is not exempt from tax, if it is a trust it may nevertheless be allowed a deduction of any amount of its gross income, without the limitations imposed in the case of individuals, which is during the taxable year paid or permanently set aside for charitable purposes, or, since the Revenue Act of 1924, section 219(b), is to be used exclusively for charitable purposes.

It was said in *Bowers* v. *Slocum*, 20 F. 2d 350 (C.A. 2, 1927), that the purpose of section 219(b) of the Revenue Act of 1918 was to encourage bequests to charitable corporations by not taxing the income which would go to them. And the Supreme Court in *Old Colony Co.* v. *Commissioner*, 301 U.S. 379, in applying section 162(a) of the Revenue Act of 1928, which was practically the same as the provision here involved, stated that the evident purpose of Congress in allowing the unlimited deduction for contributions by trusts was to encourage donations by trust estates. Both of the above cases also held that there was no requirement in the statute that the amounts that could be deducted must actually be paid out of the year's income.

[3] Sec. 219(b) of the Revenue Act of 1918.

*Bowers* v. *Slocum, supra,* also found that the law did not make the deduction depend upon the action of the executors or trustees in paying out or crediting the income on their records to charities, but rather upon the permanent setting aside of the income to the charitable organization by the will or trust itself. This view was adopted by this Court in *Estate of J. B. Whitehead,* 3 T.C. 40, and adhered to in *Lydia Hopkins,* 13 T.C. 952. See also *Rockland Oil Co.,* 22 T.C. 1307. In the *Whitehead* case we reiterated the often stated maxim that the element of charity requires a liberal construction and that tax provisions favoring charities are not to be narrowly construed; and also said (p. 48) :

The test of the propriety of the deductions claimed [under section 162(a)] is furnished by the terms of the will, and not by what was actually done thereunder * * *

And, after concluding that the addition of the second clause to section 219(b) of the Revenue Act of 1924, i.e., "or to be used exclusively for * * * charitable * * * purposes * * *," provided an additional deduction for contributions to other than qualifying charitable organizations, we said, "The use required by the will, not the character of the disbursing agency, is sufficient test, under the latter part of section 162(a)."

It is against this background that we must decide this issue. There can be no question that under the terms of the Beeghly trust agreement, the pertinent parts of which are quoted in our Findings of Fact, the corpus of this trust was irrevocably dedicated for the use and benefit of charitable organizations both during the term thereof and upon termination, and the entire net income was directed to be distributed to such organizations and for charitable purposes "either in the year in which the income becomes a part of the trust estate or in the following year." It is equally clear that because of the circumstances that arose the trustee could not carry out these directions with respect to net income in the years immediately preceding and during the year 1949, or even 1950. However, there is no indication of any wrongdoing on the part of the trustee or that any of the income was used or would be used for purposes other than those directed in the trust agreement except to pay the obligations it assumed when it acquired its principal asset and liquidated same, and the necessary costs of turning its investment into cash. The net income of the trust, when made available to the trustee free of Government claims against it, could be used for other than charitable purposes only in violation of the express terms of the trust agreement—and we will not assume that the trustee will violate its fiduciary duties.

The circumstances here are, of course, unusual, see *Rockland Oil Co., supra,* and are probably unique, so that neither a binding precedent

nor even a closely analogous guide has been found. The principal trust asset, acquired by the trust in 1945, represented for the most part the right to receive income from patents, and the parties have stipulated that the value of those and other assets received by the trust when it liquidated Cold Metal in 1945 was $12 million. But each time the trustee was successful in realizing cash on these assets the Government stepped in with a court order or lien and made it impossible or impractical for the trustee to use the cash for the purposes directed in the trust agreement. Prior to 1949 the trustee was actually prevented from receiving any substantial amount of cash, and we do not believe it can be questioned that the trustee acted properly in applying the funds it received in 1949 to payment of tax claims, legal fees and costs, and payment of its obligations for purchase of Cold Metal stock and the Products Company debt, which it assumed as part of the contract whereby it acquired the right to receive these funds. It was apparent that because of the Government's actions in tying up all the income of the trust, the income would necessarily accumulate and large parts thereof would be paid to the trustee in a lump sum in a single year, and that it would be necessary for the trustee to pay past, current, and possibly future legitimate expenses of the trust out of the accumulated income when and as received.

The facts and agreements of the parties reveal that of the $15,438,000 [4] received by the trustee in 1949, over half of it or $7,791,000 represented a return of basis in the assets received on liquidation of Cold Metal. Against the remaining receipts, respondent has allowed or agreed to allow deductions of $2,111,000, leaving net income before application of section 162(a) of $5,535,000. Considerably more than this amount, or $7,282,000, was paid by the trustee to the collector of internal revenue in 1949 as taxes assessed, for the most part by jeopardy assessment, against petitioner as transferee of Cold Metal for Cold Metal's taxes for 1943 and 1945. During 1949 the trustee paid out on the purchase price of the stock of Cold Metal the sum of $2,429,000 and paid the notes payable to Products Company in the amount of $586,000. It also invested $2,800,000 in United States securities. It is obvious that the $7,800,000 received as a return of basis was more than sufficient to pay all of these amounts. We see no reason to conclude that the net income was used to pay the investment obligations and that the receipts representing return of capital were used to pay the tax claims. It is more reasonable to assume that the trustee would apply to the payment of taxes which might be recovered the income which it was directed to pay to charities, and to use amounts

---

[4] This and the following figures are all approximate.

received as return of basis to pay on the obligations it had incurred to acquire that basis.

However, we need not be concerned about this. Our question is whether under the terms of the trust agreement an amount of gross income of the trust for the year 1949 at least equal in amount to its net income for the year was during the taxable year permanently set aside for charitable purposes, or is to be used exclusively for charitable purposes. Under the terms of the trust agreement the entire net income must be paid to charitable organizations for charitable purposes either in the year in which received or in the following year and any use of that income either to pay for the assets which produced it or to pay for other assets which will produce more income would, under the terms of this trust agreement, be used exclusively for charitable purposes at some time. Respondent's argument that some of the income was used for legal fees and other costs not related to charitable purposes means little on this issue because respondent has allowed those payments as deductions in the computation of net income and the balance of the gross income received would at least equal the entire net income, which is all that matters for our purpose. The fact that under these circumstances some portion of the year's receipts, whether they are considered capital or income, is set aside for or may be used in subsequent years for payment of reasonable and legitimate expenses of protecting the assets and collecting the income of the trust for charitable uses, should not mean that such funds, or income, are not set aside or used for charitable purposes as long as the trustee is permitted to do so under the terms of this trust.

Respondent relies principally on *John Danz*, 18 T.C. 454, affd. 231 F. 2d 673 (C.A. 9, 1955), certiorari denied 352 U.S. 828, as requiring disallowance of any amount other than amounts actually paid to charities in 1949. That case is not authority for disallowance of the deduction claimed here. In that case the trust was specifically authorized to and did actively engage in business enterprises of a commercial nature. The donor had the right to designate beneficiaries to whom the income could be paid from time to time, but they had to be charitable organizations. Until such a designation was made the income was available as working capital in the businesses and might never reach charities. In holding that only that part of the income which was actually paid to charities in the taxable year was deductible under section 162(a), we relied primarily on the fact that there was no requirement in the instrument creating the trust that any part of the gross income of the trust be paid or permanently set aside for charity—and such was not even contemplated. The majority opinion of the appellate court, affirming this Court, took the position

that the first clause of section 162(a) required the designation of the exempt beneficiaries during the taxable year, which was a positive act, and that until the donor designated the beneficiaries, there was no positive setting aside of funds for charity.

The facts here are different. Here the trust was not authorized to nor did it participate in a commercial business enterprise in competition with others, as was the situation in the *Danz* case. This trust agreement did not permit the use of income for other than charitable purposes, except to pay taxes and other charges against the trust estate, and to pay expenses incurred in protecting the trust and its defense against legal attack. In *Danz* all the income was apparently available for use in the several businesses conducted by the trust except such amounts as the donor directed be distributed to charities designated by him, and he was not required to direct its distribution at any particular time. The trust agreement here involved required the appointing committee to direct the payment or disbursement of the net income of the trust to charitable organizations for charitable purposes either in the year received or in the following year.

We think this case is more analogous to *Rockland Oil Co., supra*, wherein, because of a large number of claims against the Ringling estate and the nonliquid condition thereof, the estate was not settled for 11 years after Ringling's death and during administration the income was used to liquidate these claims. Under the will the entire residue of the estate was left in trust to pay over the annual net income, after payment of a small annuity, for a charitable purpose. In allowing a deduction for the income received during the period of administration but not actually paid out to charities in those years, under section 162(a), we said:

Pursuant to the will and codicil of John Ringling the income in question was in fact required to be set aside for charitable purposes. There is nothing in section 162(a) suggesting that its provisions are inapplicable if the estate or trust is threatened by creditors' claims which might defeat the donor's intentions. * * * [22 T.C. 1307, 1312.]

See also *Emanuelson* v. *United States*, 159 F. Supp. 34 (D. Conn. 1958).

In our opinion an amount of gross income equal at least to the net income of petitioner for the year 1949 was, under the terms of the trust agreement, required either to be permanently set aside during the year 1949 for charitable purposes, or to be used exclusively for charitable purposes, and we find nothing in section 162(a) which would prevent a deduction of that amount because under the circumstances then present the trustee was unable to actually pay that amount out to charities in 1949. Petitioner is entitled to a deduction for the year 1949 in an amount at least equal to its net income for the year 1949.

*Issue 3.*

Our conclusion on issue 2 makes unnecessary a decision on the question whether petitioner was engaged in business so as to be entitled to net operating loss carryovers and carrybacks.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

PIERCE, *J.*, dissenting: I am impelled to express my dissent from the Court's opinion on issue 2 herein, under which it has allowed the petitioner (a trust which it held under issue 1 was not exempt from income tax and was being operated principally for the benefit of the settlor and other private individuals) a deduction for charitable contributions and gifts, of an unspecified and indefinite amount stated to be "at least equal to its [entire] net income" of approximately 5½ million dollars.

The Court approved the deduction for such amount notwithstanding that, concededly, the trust actually paid only $66,300 in gifts to charitable organizations during the taxable year involved (all of which the respondent allowed for deduction); that, concededly, no other or greater amount for charitable gifts was "permanently set aside" during the taxable year, either by the trustee or on the trust accounts; and that, except for those charitable organizations which actually received said $66,300, there was no particular charitable organization named, selected, or designated as a donee, either in the trust agreement or elsewhere, to which or for whose benefit any gift of any amount was either to be paid or to be "permanently set aside" during the taxable year.

Such action of the Court is, in my view, not warranted or authorized by the controlling statute, section 162(a) of the 1939 Code [1] and the other Code section therein mentioned, for the following reasons:

---

[1] Section 162 (as it existed prior to the 1950 Amendment) provides, so far as here relevant:

The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that—

(a) There shall be allowed as a deduction (in lieu of the deduction for charitable, etc., contributions authorized by section 23(o)) any part of the gross income, without limitation, which pursuant to the terms of the will or deed creating the trust, is *during the taxable year paid or permanently set aside* for *the purposes* and *in the manner* specified in section 23(o), * * * [Emphasis supplied.]

The final clause, omitted above, is not here relevant. This clause originated in section 219(b)(1) of the Revenue Act of 1924, as an addition to the provisions of section 219(b) of the Revenue Acts of 1918 and 1921, which are cognate to those provisions of section 162(a) of the 1939 Code that are above quoted. Its history and the judicial authorities indicate that the purpose of such clause was merely to broaden the class of permissible donees, so as to include certain types of charitable organizations, such for example as foreign charities, which would not qualify under section 23(o). See S. Rept. No. 398, 68th Cong., 1st Sess., p. 25; *Estate of J. B. Whitehead*, 3 T.C. 40, 49–50, affd. 147 F. 2d 977 (C.A. 5); *Estate of Emily St. A. Tait*, 11 T.C. 731, 736–737, remanded on another

1. Petitioner made no charitable contributions or gifts during the taxable year here involved, except the $66,300 of such gifts above mentioned, which were all allowed for deduction by the respondent.

The terms "contributions" and "gifts" are synonymous except that the term "contribution" connotes a gift made for a common purpose, and usually in common with others—irrespective of whether such others may be individuals, estates, trusts, or corporations. An essential characteristic of both a contribution and a gift is that *there be a donee* to whom or for whose benefit a transfer of money or property is made without legal consideration. There can be no gift, as such, merely to a desired purpose or an altruistic idea—for this would effect no transfer, either with or without legal consideration.

The above principle is recognized in section 162(a), by the provision that the gift must be made not only for *the purpose* but also *in the manner* specified in section 23(o). The *manner* provided by this latter section, embraces the following requirements: (a) The contribution or gift must be made to or for the use of a *particular* governmental unit, or *particular* charitable organization of the type therein specified. This requirement is reenforced by the wording of section 23(o) which indicates that the donor's several *separate* gifts are then combined, in order to determine that portion of the aggregate which will be allowed as a deduction. (b) As further specified in section 23(o), such contributions or gifts will be allowed as deductions "only if verified under rules and regulations" prescribed by the Commissioner. And Regulations 111 (applicable to the taxable year here involved) provide specifically in section 29.23(o)–1 thereof:

In connection with claims for deductions under section 23(o), there shall be stated in returns of income the name and address of each organization to which a contribution or gift was made * * *. Claims for deductions under section 23(o) must be substantiated, when required by the Commissioner, by a statement from the organization to which the contribution or gift was made, showing whether the organization is a domestic organization * * * and by such other information as the Commissioner may deem necessary.

The obvious purpose of such requirement is to enable the administrative authorities to verify not only that the particular donee is a qualified charity, but also that there are no terms or conditions at-

issue (C.A. 4) ; S.M. 2620, III–2 C.B. 221, 223. In the instant case however, the terms of the trust agreement under which petitioner was created, limit the class of charitable organizations to which gifts may be made thereunder, to organizations which would qualify under section 23(o) ; and accordingly said final clause is not here applicable.

Section 23(o), mentioned in the above-quoted provisions of section 162(a), pertains to deductions for charitable contributions by an individual ; and it is in *pari materia* with section 23(q), pertaining to charitable contributions by a corporation. Under each of these sections, unlike section 162(a), the aggregate deduction allowable for all charitable gifts is limited in amount, and payment of such gifts must be made within the taxable year ; but otherwise the method for making such gifts under sections 23(o), 23(q), and 162(a) is the same.

tached to the gift which might prevent the amount of the gift from actually vesting in such donee for exclusively charitable purposes.

In the instant case, the only particular donees which were designated or identified were those which received the above-mentioned $66,300. And as to any other donees in respect of whom the Court has allowed a deduction of approximately $5 million, there is no identification on the trustee's fiduciary income tax return, or in its books and records, or otherwise, which is susceptible of verification.

2. Also, except for the above-mentioned gifts totaling $66,300, no gifts were "paid or permanently set aside" either by the trustee, or on the trust's books and records, or either by or pursuant to the terms of the trust agreement.

As heretofore stated, it is conceded that no gifts for charitable purposes, other than those included in said $66,300, actually were paid during the taxable year; and it also is conceded that no other such gifts were "permanently set aside" or otherwise provided for, either by the trustee or in the trust accounts. The Court relied, however, on a theory that such other gifts were made by operation of the terms of the trust agreement. But an examination of said trust agreement reveals that such theory is unsound.

The trust agreement, in its preamble, expressed the "desire" of the settlor-donor, that the income of the trust should be used exclusively for charitable purposes; but it also stated that—

the Donor *realizes the impossibility of anticipating* at this time how * * * such proceeds should be divided among such purposes and further believes, as do others, that funds so to be devoted can be made to accomplish broader and more useful purposes if the terms of the devotion of such funds to such purposes *shall permit of change from time to time* in the *particular objects or enterprises* to be assisted, and *in the channels* through which such funds are applied; * * * [Emphasis supplied.]

Accordingly, the settlor-donor did not name or designate in the trust agreement any particular organization as a donee; but rather, he caused to be incorporated in the terms and conditions of the trust, which the trustee agreed to observe, a provision for the creation of an "Appointing Committee" which was charged with the duty of selecting, annually, the particular charitable organizations to or for whose benefit all the net income for each year was to be disbursed.

For a period of approximately 4 years prior to 1945, the trust operated as a passive trust, and actually did pay out all its net income to particular charitable organizations, in the manner and in accordance with the methods prescribed in the trust agreement. But during the taxable year 1949 which is here involved, the trust was (as found by the Court under issue 1) being used as a "vehicle" for the primary benefit of the settlor and other private individuals, with

"charities running a poor second"; and during said year, none of the above-mentioned procedures for designating charitable donees and gifts, were observed except as to the above-mentioned $66,300.

The case of *Bowers* v. *Slocum*, 20 F. 2d 350 (C.A. 2), upon which the Court relied, is distinguishable on its facts. There, a decedent had by will given her residuary estate to 35 specifically named and identified charitable organizations. The executors had been unable to pay the income from such residue to said donee-charities during the taxable year involved, while the estate was in the process of being administered. The Second Circuit held, however, that deductions for the gifts of such income were deductible in said taxable year, without any payment or any credit having been entered on the accounts of the executors—because "the income, when received by the executors, was by the will permanently set aside for the [specifically identified] residuary legatees." In the instant case, on the other hand, the trust agreement itself did not designate any particular donees or make any particular gifts. Rather, it merely expressed the settlor's "desire" that charitable gifts should be made from time to time; and it then created an "Appointing Committee" to make such gifts annually. This Committee, however, took no action to carry out the settlor's mandate within the taxable year, except as to the $66,300 of charitable gifts for which the respondent has allowed deductions.

3. The Court has suggested in its opinion herein, that the petitioner was prevented from making additional gifts during the taxable year, because of tax claims made against it by the Government. This suggestion, however, is without merit, and immaterial. This Court recognized in *Rockland Oil Co.*, 22 T.C. 1307, that where a gift had been made to an identifiable donee, deduction therefor would not be defeated by the fact that all or some portion thereof might have to be applied in satisfaction of creditors' claims, rather than being paid to the designated donee.

Moreover, the mere fact that a donor (whether such donor be an individual, an estate or trust, or a corporation) is unable for any reason to make an intended gift during a particular year, does not give such donor any right under the controlling statutes to a deduction for the intended but unmade gift. Many good intentions are frustrated. But in the case of income taxes, donors must wait until any intended charitable gift is actually made in the prescribed manner before it can give rise to a deduction therefor.

4. Finally, in the instant case there is no certainty that any portion of the $5 million for which the Court has allowed deduction, will ever find its way as a gift to any charitable organization.

In *John Danz*, 18 T.C. 454, 463–464, affd. 231 F. 2d 673 (C.A. 9), certiorari denied 352 U.S. 828, this Court said:

An annual deduction is not allowed by section 162(a) merely because the property of the trust must eventually go to charities. * * * The record does not show that any other amounts [except the amounts of specific contributions actually made during the taxable year] were ever paid or permanently set aside for the purposes and in the manner specified in section 23(o) but it shows that large portions of the gross income for the taxable years were used for other purposes such as to repay loans, to pay interest on loans, and to make new investments. The income of a particular year used for such purposes might never go to any charity. Thus, the trust has not shown that it is entitled to deduct all of its otherwise taxable net income under section 162(a), despite the fact that the ultimate distribution of its properties must be for purposes and in the manner specified in section 23(o). Not only does the petitioner fail to qualify under the plain wording of section 162(a) but it also seems unlikely that Congress intended to grant a deduction from current income where the income could be put to uses of the trust in its effort to create more income or profits for charities and might never reach any charity as income or principal, for example, it might be lost in the business venture.

I would have decided issue 2 for the respondent.

TURNER, OPPER, and ATKINS, *JJ.*, agree with this dissent.